**SCHULZ, Appellee v FIBLE, Appellant, and GABE, Appellee.**

Ohio Appeals, 1st District, Hamilton County.

No. 6216—Decided January 18, 1943.

Mr. Robert E. Steman, Cincinnati, for Charlotta Schulz.
Messrs. Galvin & Tracy, Cincinnati, and Mr. J. Paul Geoghegan, Cincinnati, for Clarence L. Fible.

## OPINION

By ROSS, J.

This is an appeal on questions of law from the Court of Common Pleas of Hamilton County, Ohio. The action was instituted by a guest, passenger in an automobile driven by one of the defendants. By the verdict of the jury, the defendant driver was held liable and his co-defendant dismissed.

Clarence L. Fible, appellant, one of the defendants, on Sunday, December 22nd, 1940, drove away from his home in a 1937 Chevrolet coach. He had vision only in one eye and his hearing was defective. Seated beside him on the front seat was his wife, directly behind her in the rear seat was her sister the plaintiff, appellee, and seated beside her on the rear seat was her mother, a woman some 73 years of age. The ultimate object of the trip was a visit to a cemetery. It was intended also to stop at the residence of some one who had advertised the sale of an electric train which Mr. and Mrs. Fible contemplated purchasing for their child. The plaintiff had been making her home with Fible and his wife and still resided with them at the time of the trial. The mother lived in an apartment above that occupied by the Fibles.

The course selected by the defendant Fible took the party across a viaduct in the City of Cincinnati, beneath which were located a number of railroad tracks. Fible drove upon the viaduct at a speed not to exceed twenty-five miles per hour. The roadway of the viaduct was 40 feet wide. A painted line marked the center of the roadway. Fible drove the automobile close to this center line. Preceding him at a distance of some 50 feet was the automobile driven by his co-defendant Gabe. When Fible had reached a point approximately half-way across the viaduct a locomotive passed under it emitting a large quantity of dense white vapor which enveloped the viaduct. Fible testified he immediately slowed

the movement of the car from 25 to 18 miles an hour. The plaintiff states he did not reduce speed. It is admitted by Fible that he could not see for more than six feet ahead of the car after entering the vapor. Gabe, his co-defendant, states that, after entering the vapor, he could not see the radiator cap on his automobile. It is clearly evident that the vapor was very dense. After proceeding a short distance in the fog, the front of the automobile driven by Fible collided with the rear of that driven by Gabe. The plaintiff was dislodged from her seat and her scalp severely torn by impact with some part of the vehicle in which she was riding. Gabe had reduced the speed at which he was traveling, when entering the vapor, to some five miles an hour, and his automobile was almost stationary at the time of the collision. There is also some evidence that he changed his direction from the curb of the viaduct toward the center line after entering the fog.

The plaintiff testified that when the automobile driven by Fible was approaching the vapor she said: "Its the worst I have ever seen, don't go through." Fible was called by the plaintiff as upon cross-examination—the bill of exceptions contains the following excerpt from such cross-examination:

"Q. Who was in the car with you?

A. My wife, my wife's mother and sister.

Q. They were talking as they were traveling along weren't they?

A. Yes.

Q. You heard them talking, didn't you?

A. Yes, they were talking.

Q. Didn't you hear Miss Schulz say—Don't go through that?

A. Well, I don't know, she might have said it, but I didn't just hear her say that.

Q. Did you hear her say something?

A. I didn't hear her say anything distinctly—if she said it I didn't get it."

There is evidence that the plaintiff's mother, who also has defective hearing, and who was sitting beside the plaintiff, heard the admonition. There is no evidence that there was a "discussion" about the vapor. Nor is there evidence that either the wife of Fible or her mother made any comment about it, or that Fible said anything at the time, or gave any sign indicating he had heard the remark.

The plaintiff was a guest in the vehicle driven by Fible.

The verdict of the jury against Fible cannot be sustained unless there is substantial evidence that the injuries received by plaintiff were proximately caused by the "wilful or wanton misconduct" of the defendant Fible. §6308-6, GC.

No mere negligence, whether recognized by statute or otherwise, is sufficient. **Universal Concrete Pipe Co. v Bassett, 130 Oh St., 567.** The third paragraph of the syllabus in this case is:

"Regardless of the fact that the term 'wanton negligence' is sometimes used both in text and opinion, such use is unwarranted, as it is a misnomer, pure and simple. Wanton misconduct is positive in nature, while mere negligence is naturally negative."

And, at pages 574 and 575 of the opinion:

"In the first place, there is no such thing as wilful negligence and there is no such thing as wanton negligence.

"Although actions for wilful or wanton conduct have often been treated under the head of negligence actions, 'An action based upon wilful or wanton misconduct is apart from the action for negligent conduct. * * * The difference is one of kind, not merely of degree. Negligence does not have for its base either wilfulness or wantonness, while misconduct which is merely negligent is never either wilful or wanton.' Bordonaro v Senk, 109 Conn., 428, 147 A., 136.

"A wrongdoer acts wantonly and wilfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist. Conrad v Wheelock, 24 F. (2nd), 996."

And, at page 579:

"While wanton misconduct and ordinary negligence are, as a matter of law, as far apart as the poles of the axis, under our liberal code pleading (§11306 GC) they are joinable in one action, as they grow out of the same transaction; but they are just as repugnant and inconsistent as it is possible for two causes of action to be."

The "misconduct" which forms the basis of recovery involves an attitude of mind. **Jenkins v Sharp, 140 Oh St., 80 (Ohio Bar, 6-15-42).** At page 82, it is stated:

"Wantonness is essentially an attitude of mind and imparts to an act of misconduct a tortious character. This principle is consonant with the statement in **Universal Concrete Pipe Co. v Bassett, 130 Oh St., 567,** 200 N. E., 843, that 'wanton misconduct is such as manifests a disposition to perversity.' Such a disposition or mental state is shown by a person, when, notwithstanding his conscious and timely knowledge of an approach to an unusual danger and of common probability of injury to others, he proceeds into the presence of the danger, with indifference to consequences and with absence of all care. This statement of the

**18**

rule contains the essence of general principles heretofore pronounced by this court. **Universal Concrete Pipe Co. v Bassett, supra; Vecchio v Vecchio, 131 Oh St, 59, 1 N. E. (2d), 624; Morrow v Hume, Admx., 131 Oh St, 319, 3 N. E. (2d), 39; Akers v Stirn, 136 Oh St, 245, 25 N. E. (2d), 286.**"

Obviously mere bad judgment or a failure to do what an ordinarily prudent person is accustomed to do under the same or similar circumstances is not sufficient to justify the verdict against Fible. It is doubtful whether the evidence in this case would even sustain either of these charges. It is questionable whether Fible could anticipate that a vehicle preceding him would be caused to come to almost a complete stop. :

The Supreme Court has had occasion frequently to consider the question of what is and what is not "wilful or wanton misconduct". Each case, of course, varies according to the facts involved. **Jenkins v Sharp, 140 Oh St, 80; Akers v Stirn, 136 Oh St, 245; Morrow v Hume, 131 Oh St, 319; Universal Concrete Pipe Co. v Bassett, 130 Oh St, 567.**

From these cases, however, certain outstanding guides to a determination of the character of conduct of the defendant here involved are presented.

1. The inquiry of the trier of facts must be directed to a determination of the "mental state" of the defendant at the time the injuries were received.

2. There must be substantial evidence supporting the conclusion that such "mental state" constituted a "disposition to perversity".

3. Neither mere speed, nor absence of ordinary care, nor bad judgment, nor violation of safety statutes, alone, is sufficient.

4. There must be an absolute indifference to consequences of the defendant's acts.

5. Conscious and timely knowledge of approach to unusual danger, with a known probability of injury to others, if coupled with indifference to such consequences and an absence of all care present evidence of wilful and wanton misconduct.

6. There must be a reckless indifference to the interests of others.

Now in the first place, the fact that the defendant Fible was occupied in a mission involving a trip to a cemetery does not suggest the attitude of mind necessary to predicate a conclusion that he was either in a reckless mood or that he had no consideration for the interests of others.

The fact that he was proceeding at a speed of only 25 miles per hour before any unusual occurrence suggested a reduction of speed suggests no improper mental state.

There is no evidence that the occupants of the vehicle other than plaintiff were alarmed by the emergency.

There is no evidence that Fible had any reason to suppose the car in front of him would come to almost a complete stop and that he recklessly drove into it.

There is **no evidence** that Fible in spite of admonition failed to observe care for the safety of his passengers.

An examination of the record fails to show even a scintilla of evidence suggesting that the attitude of mind of Fible was such as to warrant the conclusion that his acts constituted wilful or wanton misconduct. It is doubtful, as said before, whether the evidence would justify a verdict based on ordinary negligence, although it is intimated that Fible violated the statute requiring that one must drive so that the vehicle may be stopped within the assured clear distance ahead. Even if such were the case, this does not constitute in itself wanton or wilful misconduct.

As has been noted hereinbefore, it is questionable, at least, whether the mere puff of vapor affected the assured clear distance ahead to such an extent that Fible should have concluded that the vehicle which was at more than a safe distance ahead of him when he entered the fog would slow down to almost a complete stop.

A great portion of the briefs of the appellee is devoted to the task of showing that Fible, in spite of warning and admonition from the plaintiff, recklessly drove the automobile into an area menaced by a threat of immediate injury to the occupants of the automobile.

If giving the evidence an aspect most favorable to the plaintiff, it may be considered that there was evidence that Fible heard the admonition, still the most that could be charged is that he used his own judgment in driving the vehicle, for the operation of which he was alone responsible.

The vehicle in front of him, driven by Gabe, was at more than a safe distance ahead of him as it entered the fog and was proceeding at a speed which would have quickly carried it through the puff of vapor. There was nothing to cause Fible to believe Gabe would not continue to maintain the safe interval that existed between the automobiles. Fible had observed the area which the vapor filled just before it arose. He knew its continuance would be brief. The way was then clear. How could he possibly anticipate that Gabe would come to almost a complete stop? There is not a scintilla of evidence in the record to sustain the contention that Fible recklessly drove the automobile into an area of known danger, or that he had any reasonable ground to believe that such danger existed.

So finding, it is our conclusion that the judgment of the trial court must be reversed, and judgment here entered for the defendant, Fible.

MATTHEWS, PJ., concurs.